CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

April 22, 2025

LAURA A. AUSTIN, CLERK
BY: s/A. Beeson
    DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **TERELL MOORE,** | ) | |
| Petitioner, | ) | Case No. 7:23cv00456 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **CHADWICK DOTSON, Director,** | ) | |
| **Virginia Department of Corrections,**[1] | ) | By: Pamela Meade Sargent |
| Respondent. | ) | United States Magistrate Judge |

Petitioner Terell Moore, ("Moore"), a Virginia inmate, has filed a second or successive petition for a writ of habeas corpus under 28 U.S.C. § 2254, ("Petition"), challenging his 2005 conviction for first-degree murder.[2] Moore alleges that new evidence, not previously available to him, when considered with the evidence as a whole, is sufficient to show that, but for constitutional error, no reasonable factfinder would have found him guilty, *i.e.*, that he is "actually innocent." The Fourth Circuit Court of Appeals authorized the filing of this second or successive Petition, as required by 28 U.S.C. § 2244(b)(3). *In re: Terell Moore*, No. 23-177 (4th Cir. July 24, 2023). The Respondent has filed a Motion to Dismiss the Petition, and the matter is ripe for decision. For the reasons stated below, the Respondent's Motion to Dismiss will be granted.

---

[1] As requested by the Respondent, Chadwick Dotson has been substituted in place of Harold W. Clarke, who has retired.

[2] Moore filed his Petition and Amended Petition pro se. Counsel subsequently entered an appearance on his behalf.

# I. PROCEDURAL HISTORY

Following a jury trial, the Tazewell County Circuit Court convicted Moore of the first-degree murder of Brandi Hatfield, ("Hatfield"), and imposed a life sentence, as recommended by the jury. The court entered its final judgment order on June 27, 2005. Moore appealed to the Court of Appeals of Virginia, raising several issues, including sufficiency of the evidence. A three-judge panel of the court denied his appeal in an opinion issued August 11, 2006. The Supreme Court of Virginia refused his further petition for appeal on December 12, 2006. Moore filed a petition for habeas corpus in the state circuit court, which that court dismissed on December 17, 2007. The Supreme Court of Virginia refused his appeal from that decision on June 24, 2008. Moore then filed a petition in this court under 28 U.S.C. § 2254, raising several allegations of ineffective assistance of counsel and challenging the sufficiency of the evidence. By Memorandum Opinion and Order entered August 12, 2009, the court dismissed his petition. *See Moore v. Johnson*, No. 7:08cv00526 (Aug. 12, 2009) (Conrad, J.). The Fourth Circuit Court of Appeals dismissed his appeal on April 2, 2010.

Moore continued his efforts to challenge his conviction, filing three subsequent state habeas petitions and two prior requests to file second or successive federal petitions, all of which were denied. On January 18, 2023, he filed a petition for a writ of actual innocence in the Court of Appeals of Virginia, based upon the same new evidence presented in his Petition filed in this court. The state court dismissed the petition on April 28, 2023, finding that the evidence was not "unavailable" at the time of trial. Moore immediately filed a third motion for authorization to file a successive petition. Upon authorization from the Fourth Circuit Court of Appeals, Moore's Petition was received and filed in this court on July 25, 2023. In his Petition, Moore alleges that the affidavit of Dr. Jack Daniel, Forensic Pathologist, dated November 7, 2022, constitutes new exonerating

evidence about the victim's time of death and shows that trial counsel was ineffective in failing to investigate, challenge and oppose the medical examiner's testimony at his trial.[3]

## II. RELEVANT FACTS

In his 2009 Memorandum Opinion, Judge Conrad quoted the Court of Appeals of Virginia's summary on Moore's direct appeal of the evidence presented at trial:

> The evidence showed that [Moore] had a long-term relationship with [Sarah] Jackson and also had a relationship with the victim [Brandi Hatfield]. Jackson,[] who at the time was staying in a motel room with [Moore], testified [Moore] stole some checks from the victim and she and [Moore] cashed the checks on several occasions. Jackson also stated the victim confronted [Moore] about the stolen checks, and on May 29, 2003, [Moore] told Jackson he was going to the victim's apartment to make arrangements to repay her for the checks. [Moore] returned to the motel room at 1:00 a.m., and he told Jackson the victim was not at home. Jackson fell asleep and was awakened when [Moore] returned to their motel room at 6:00 a.m., wearing a different shirt. [Moore] told Jackson the victim had agreed to accept the money. Later, after Jackson learned the victim was dead, [Moore]told Jackson to tell the police he was with her all night. Jackson also stated that [Moore] changed into new clothes after he learned the police wanted to interview him, stating that he did not want the victim's "hair or anything on" him while he was being questioned.
>
> Brenda Fitzgerald, a neighbor of the victim, testified that on May 29, 2003, she heard [Moore] and the victim discussing checks. Fitzgerald also saw [Moore] with the victim at the apartment complex at about midnight that night. A witness testified that he gave [Moore] a ride

---

[3] This was the sole issue raised in his Petition when he sought authorization to file this successive Petition. The Fourth Circuit Court of Appeals authorized the successive Petition "so the district court has the opportunity to evaluate the effect of Dr. Daniel's affidavit in light of the full scope of the prosecution's evidence." Docket Item No. 2 at 1. Moore subsequently amended his Petition in this court, adding two more issues regarding new impeachment evidence against prosecution witnesses Sarah Jackson and Jamie Weis. Those issues will not be ruled upon by this court.

from the victim's apartment complex to a motel at 12:30 a.m. A taxi driver testified that he picked up a man, who gave the name "Mike," from a motel at about 2:00 a.m. and took him to the victim's apartment complex. At about 4:00 or 4:30 a.m., Fitzgerald heard "bumping" sounds coming from the victim's apartment and she later heard water running in the kitchen of the victim's apartment. Sometime between 5:00 a.m. and 6:00 a.m., Fitzgerald saw [Moore] standing on a sidewalk in the apartment complex.

The victim's body was found in her apartment later that morning. She had been stabbed numerous times and died as a result of the wounds. Special Agent Santolla testified a mop and bucket containing solution were in the apartment, and there was evidence that the floors and walls may have been cleaned. There were no indications of a break-in at the victim's apartment.

Jamie Weiss, a convicted felon, testified that he met [Moore] while they were in jail together. Weiss also testified that [Moore] told him, "I know that I done it. They know that I done it. But knowing it and proving it is two different things."

[Moore] gave several statements to law enforcement. In all of the statements he said he visited the victim at her apartment until after midnight when someone gave him a ride to his motel room. [Moore] denied he returned to the victim's apartment later that morning. [Moore] testified he left the victim's apartment at about 11:30 p.m., visited another resident of the apartment complex, then caught a ride to his motel room, arriving there at about 12:30 a.m. Contrary to his prior statements, at the trial he testified he took a taxi back to the victim's apartment at about 3:00 a.m. He stated he gave the name "Mike" to the taxi company. [Moore] testified he previously lied to law enforcement about returning to the apartment complex because he purchased drugs when he went back there and he did not want the police to find out about the purchase. [Moore] stated that he bought drugs, smoked the drugs, then returned to the motel room. [Moore] also admitted that, after the offense, he purchased new clothes and changed into those clothes before he met with police. [Moore] denied that he killed the victim.

*Moore v. Johnson*, No. 7:08cv00526, Memorandum Opinion, at 1-2 (Aug. 12, 2009).

In its April 2023 ruling, dismissing Moore's petition for a writ of actual innocence, the Court of Appeals of Virginia recited the following additional facts:

[Hatfield] was found dead in her apartment … around 9:00 a.m. on May 30, 2003. The medical examiner, Dr. Gregory Wanger, ruled her death a homicide and concluded that she died of multiple stab wounds. During the autopsy, Dr. Wanger found about 75 cubic centimeters of food and liquid in [Hatfield's] stomach. When asked at trial about the stomach contents, Dr. Wanger stated that the contents were consistent with an egg roll. He testified that it "usually takes somewhere between two and four hours" for food to "exit the stomach." Dr. Wanger described this period as a "rough rule" and explained that fatty food "takes longer" to exit than less fatty food. On cross-examination, Dr. Wanger acknowledged that he could not establish a time of death; he could say only that [Hatfield] died "somewhere in the period of two to four hours after [she] ate."

Moore's girlfriend, Sarah Jackson, testified that Moore had stolen several personal checks from [Hatfield] and directed Jackson to forge [Hatfield's] signature on them. Moore and Jackson then passed the forged checks at local businesses. On the morning of May 29, 2003, [Hatfield] executed affidavits of forgery at her bank. That afternoon she met with Bluefield Police Investigator Murray and a Wal-Mart loss prevention officer to review surveillance video footage showing a man and a woman passing two of the forged checks. Investigator Murray, who knew Moore and Jackson, identified Jackson as the woman depicted in the Wal-Mart [video] and "believed" the man was Moore but did not positively identify him. Investigator Murray planned to meet [Hatfield] at another store on the morning of May 30 to review security footage related to another forged check.

[Hatfield's] neighbor heard Moore and [Hatfield] arguing about checks on the evening of May 29.[] Moore made several trips between the motel and … the vicinity of [Hatfield's] apartment at different times throughout the night. Moore's DNA was found on cigarette butts in [Hatfield's] apartment.  Two of Moore's acquaintances testified that when they encountered him several blocks … [away from Hatfield's apartment complex] around 5:30 a.m. on May 30, Moore was carrying something wrapped in a white towel. Jackson testified that Moore returned to the motel sometime after 6:00 a.m. on May 30. Moore told Jackson that Moore had "talked to" [Hatfield] and she had agreed to "accept … money" for the forged checks. Moore also instructed her to falsely tell the police officers investigating [Hatfield's] murder that Moore had been with her at the motel "all night" on May 29 and 30.

Moore testified in his own defense. … Moore claimed that he went to [Hatfield's] apartment around 10:30 p.m. on May 29, 2003. [Hatfield] was "glad to see" him; they ingested drugs together and engaged in consensual sexual intercourse. [Hatfield] then ate an egg roll. Moore estimated that he spent 45 minutes to an hour with [Hatfield] and that she was alive when he left her apartment between 11:00 and 11:30 p.m. on May 29.

Moore visited an acquaintance who lived in [Hatfield's apartment complex] before returning to the motel between 12:30 and 1:00 a.m. He admitted that he returned to [the apartment complex] in a taxi around 3:00 a.m. but stated that he went there to buy crack cocaine and did not return to [Hatfield's] apartment. He claimed that he was holding a can containing crack cocaine under the towel when his acquaintances saw him at 5:30 a.m. on May 30, 2003.

(Record No. 0139-23-3, Order 2-3, Apr. 28, 2023) (Docket Item No. 1-10 at 2-3).

Dr. Daniel's November 7, 2022, Affidavit, (Docket Item No. 1-5) ("Dr. Daniel's Affidavit"), states in pertinent part:

… In connection with this matter, I have reviewed materials provided by counsel pertaining to the death of … Hatfield … including information from (a) Report of Investigation by Medical Examiner/Investigator; (b) Report of Autopsy (conducted on Monday, 2 June 2003 by forensic pathologist Gregory P. Wanger, M.D., …); (c) portions of trial transcripts from *Commonwealth v. Terrell Moore*. [sic] …

… The "INTERNAL EXAMINATION" section of the report describes the Gastrointestinal system as follows: "The esophageal, gastric and duodenal mucosal are intact. The stomach holds approximately 75cc of a mixture of brown fluid, green cabbage-like vegetables, light colored orange corn fragments and a few fragments of starchy white material…. (There are no other contents noted within either the small or large bowel.)

… Gastric emptying is the process by which the contents of the stomach are moved into the duodenum. … Liquids will ordinarily empty faster than solids, and smaller objects faster than larger. …

6

… The time of death was apparently an issue at trial; when asked whether he was able to ascertain the time [Hatfield] actually died by using stomach contents, Dr. Wanger testified, "Only in the relative sense that it's somewhere in the period of two to four hours after she ate".

… Dr. Wanger did not clarify what he meant by "somewhere in the period of two to four hours after she ate", but if we assume for the sake of discussion that the food was consumed at midnight, it would appear that he was saying under such circumstances [Hatfield] would necessarily have died at or after 2 a.m., and also before 4 a.m.

… In their textbook Forensic Pathology (DiMaio & DiMaio; Elsevier, 1989; pp. 36-39), the Drs. DiMaio note the following: "One way of attempting to determine the time of death is by establishing the time interval between eating and death and then finding out the time the deceased last ate. A perusal of standard forensic textbooks gives a number of estimations of how long it takes to digest a meal. Spitz and Fisher [Medicolegal Investigation of Death (Thomas, 1980)] state that a small meal (a sandwich) is digested in 1-2 h and a large meal takes 3-5 h. Adelson['s The Pathology of Homicide (Thomas, 1974)] says gastric emptying depends on the size and content of the meal, with a light meal taking ½ to 2 h to digest, a medium size meal 3-4 h, and a heavy meal 4-6 h."

… DiMaio emphasizes that "meal emptying time is a variable phenomenon in health subjects with significant differences from day to day in the same and different individuals…; gastric emptying of either liquids or solids is subject to relatively wide differences in the same and different individuals even if the same meal is ingested …" [&] if in addition to this we add differences in the weight, caloric content and composition of the meal, we would see even greater differences in half emptying time." (DiMaio; p. 39)

…Regarding what is present in the stomach at the time of autopsy, Simpson's Forensic Medicine states, "Analysis of gastric contents – other than for toxicological purposes – may occasionally assist in an investigation, where such analysis identifies food components capable of corroborating or refuting other evidence that suggests that a particular meal had been eaten at a particular time, but cannot reliably be used to determine time of death." (Payne-James, et al[.], Simpson's Forensic Medicine, 13th Ed[.], 2011; p.53)

… Bernard Knight's Forensic Pathology (Arnold; 2nd Edition, 1996) notes that, "Even if one accepts an 'average' gastric transit time of an

'average' meal as being on the order of 2-3 hours, the assumption that death took place within this time can only be valid if the death was quite sudden and unexpected with no stressful prodromal event. For example, if an unsuspecting person was suddenly shot or run down without warning and died almost immediately, then one can assume that the undisturbed physiological processes of digestion – albeit with its many variables – had taken place. If, however, a domestic dispute or a developing altercation culminated in a strangulation or stabbing, the antecedent stresses would almost certainly affect gastric function and render invalid any interpretation of the condition of stomach contents at autopsy." (Knight, p. 90)

… Moreover, it is important to note that *the stomach was not actually empty* at the time of autopsy in this case. Neither do we know the total volume of food consumed to start with, only that at the time of autopsy the stomach contained approximately 75cc of mixed liquid and solid food material including recognizable bits of corn and vegetable fragments resembling cabbage. In this setting (stomach not empty), whether it is estimated to take between 30 minutes and 2 hours for a "light" or "small" meal to exit the stomach, or 4-5 hours for a large meal, using estimates based on gastric emptying times should be utilized with great caution, if they can be reliably used at all.

…Some food items did remain at least partly recognizable in this instance ("green cabbage-like vegetables, light colored orange corn fragments, and a few fragments of starchy white material"). However, no recognizably fried, oily or fatty material was noted in the stomach contents, raising the question of whether or not the stomach contents might actually represent another type of vegetable wrap with less – or no -- fat apart from a deep-fried sort of egg roll. No chyme or other intestinal contents are described within the duodenum, elsewhere in the small intestine, or in the cecum or beyond in the large intestine.

… "Normal" gastric emptying times (how long it takes for food to move from the stomach into the first part of the small intestine, known at the duodenum) are highly variable, depending on such factors as the nature, volume, and nutrient/chemical composition of the stomach contents, as well as any of the individual's overall acute and/or chronic physical conditions and sometimes emotional states.

…Although it is true that under many circumstances a meal may take two hours or four hours or sometimes even longer to pass entirely from the … stomach into the duodenum, it is also true that in general a smaller meal takes less time than a larger meal of the same composition,

so that normal gastric emptying time for small meals may sometimes
be on the order of one hour or even less, depending on the meal.

…

… It is my opinion that: (a) the findings are consistent with [Hatfield]
having consumed a relatively small or light meal of around 75cc in final
volume (following chewing, admixing, [sic] and subjecting food to
gastric acid and digestive enzymes), and (b) it is possible that such a
meal may take no more than between ½ h and 2 hours to clear the
stomach.

… In other words, I believe that if a small or light meal of approximate
final volume 75 cc was consumed at – for example -- midnight, the time
of death could have been as early as approximately 12:30 a.m. (or if a
small meal was taken at 11:30 p.m., then the time of death could have
been as early as approximately midnight).

(Dr. Daniel's Affidavit at 1-4.)

In his Amended Petition, Moore stated that he also had discovered that
Jackson, who prosecutors had represented had not been offered a deal on charges
that she had forged and uttered the victim's checks, had pleaded guilty to multiple
counts of forging and uttering the victim's checks just one day after Moore was
convicted and was given concurrent sentences of 10 years' imprisonment with eight
years suspended, for only two years to serve, while all other charges against her were
dismissed. Moore also stated that he had discovered that, subsequent to his testimony
against Moore, Weis was charged and convicted in Georgia. According to records
related to that Georgia conviction, Weis suffered from "major mental illnesses."
Moore asserts that the Georgia court records show that, less than a year after
testifying against Moore, Weis was diagnosed with schizoaffective personality
disorder and that Weis had suffered from mental/emotional problems since age seven
and had previously been on medication for schizophrenia. These records also
documented that Weis, while in custody, had put his head in the toilet and drank
toilet water and urine.

9

At trial, Weis's cellmate in the Tazewell County Jail, Shawn Lockhart, ("Lockhart"), testified that he never heard Moore, who was housed two cells away from his and Weis's cell, say anything about Moore's case. (Docket Item No. 28-9 at 43-44.) Lockhart also stated that Weis "liked a lot of attention." (Docket Item No. 28-9 at 44.) When asked to explain this statement, Lockhart stated that Weis would put his head in the toilet and blow bubbles in the water, would eat food off of the floor and out of the toilet and would drink toilet water from a cup. (Docket Item No. 28-9 at 44-45.) Based on this evidence, Moore's defense attorney argued in closing that Weis was "a little bit off." (Docket Item No. 28-8 at 52.)

Christopher Dye, ("Dye"), who lived in the victim's apartment complex, testified that he knew Jackson, but he never talked to her because she was the "[v]ery jealous type." (Docket Item No. 28-9 at 60.) Dye also said that, if Jackson testified that she was not a jealous person, that testimony was incorrect. (Docket Item No. 28-9 at 61.) Dye also testified that he did not like to associate with Jackson because "she was always up to something to a certain degree." (Docket Item No. 28-9 at 61.) He said that he considered her untrustworthy. (Docket Item No. 28-9 at 62.)

Thomas Kelsor, ("Kelsor"), testified that he gave Moore and Jackson a ride from the victim's apartment complex to their motel around 10 p.m. on May 29. (Docket Item No. 28-9 at 70.) Then, Kelsor said, after 11 p.m. that evening, Moore called him, and he gave Moore a ride back to the apartment complex. (Docket Item No. 28-9 at 70-71.)  Kelsor testified that, later that night and into the next morning, Jackson called him three times asking him to come pick her up and take her back to the apartment complex. (Docket Item No. 28-9 at 71-74.) According to Kelsor, Jackson called him around 11 p.m. on May 29 and at 1 a.m. and 3 a.m. on May 30. (Docket Item No. 28-9 at 71-74.) Kelsor stated that, if Jackson had testified that she was asleep from approximately 11:30 p.m. that night to 6 a.m. the next morning, that

was not true because she called him three times that night. (Docket Item No. 28-9 at 74.)

Jackson testified that, in exchange for testifying against Moore, the charges against her for murder and conspiracy to commit murder were reduced to a charge of accessory after the fact. (Docket Item No. 28-9 at 82.) Jackson also admitted that she had written letters to Moore stating that she thought the wrong person had been charged with Hatfield's murder. (Docket Item No. 28-9 at 84.)

Moore testified that Jackson had a bad drug habit. (Docket Item No. 28-9 at 101.) Moore stated that, at one point, he spent $2,000 a week just on Jackson's "drug habit alone." (Docket Item No. 28-9 at 101.) Moore said that, as a result of his relationship with Jackson, he became addicted to OxyContin and cocaine. (Docket Item No. 28-9 at 101.) Moore also testified that Jackson worked as a stripper to support their drug habits. (Docket Item No. 28-9 at 101, 143-44.)

### III.    STANDARD OF REVIEW

This is not Moore's first habeas petition, but a second or successive petition. Although the Fourth Circuit Court of Appeals has authorized the filing of this Petition pursuant to 28 U.S.C. § 2244(b)(3), this court must determine that Moore meets the requirements of § 2244(b)(2)(B) before the court can render any opinion on the merits.  *See* 28 U.S.C.A. § 2244(b)(4) (West 2019); *see also McLeod v. Peguese*, 337 F. App'x 316, 324 (4th Cir. 2009) (citing *Bennett v. United States*, 119 F.3d 468, 469-70 (7th Cir 1997)).

### A.  Requirements for Filing Second or Successive Petition

Where, as here, a petitioner raises a claim in a successive petition that was not presented in his prior habeas petition, the petition must be dismissed unless he shows:

11

> (i)     [T]he factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii)    [T]he facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2244(b)(2)(B)(i)-(ii) (West 2019).[4]

The Fourth Circuit has held that § 2244(b)(2)(B) has three essential components:

> First the claim must rely on a "factual predicate [that] could not have been discovered previously through the exercise of due diligence." … Second, the claim must describe constitutional error…. Third, the newly discovered facts upon which the claim is based, when viewed in conjunction with "the evidence as a whole," must "be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

*In re Williams*, 330 F.3d 277, 282 (4th Cir. 2003) (internal citations omitted). Based on the stringent requirements of § 2244(b)(2)(B), the Fourth Circuit has referred to this section as providing a "narrow exception[ ]" and a "narrow gateway." *McLeod*, 337 F. App'x at 324. "Respect for the finality of criminal judgments provides the impetus for [this] heavy burden placed on successive § 2254 petitions …." *McLeod*, 337 F. App'x at 324 (citing *Calderon v. Thompson*, 523 U.S. 538, 558 (1998)). Furthermore, § 2244(b)(4) directs that "[a] district court shall dismiss any claim presented in a second or successive application that the court of appeals has

---

[4] Moore does not assert that his claims rely on a new rule of constitutional law under 28 U.S.C. § 2244(b)(2)(A).

authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section." 28 U.S.C.A. § 2244(b)(4).

## B. Ineffective Assistance of Counsel

Moore alleges that trial counsel was ineffective because she failed to investigate the time-of-death estimate of the medical examiner, failed to effectively cross-examine him and failed to obtain an expert who would offer a different opinion. When reviewing counsel's performance, courts apply a highly deferential standard. A petitioner must show that (1) counsel's performance was so deficient that she was not functioning as counsel guaranteed by the Sixth Amendment *and* (2) that the performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms." *Strickland,* 466 U.S. at 688. The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable strategy decisions. *Strickland,* 466 U.S. at 689–90. In the context of habeas cases, the court is "doubly deferential" on ineffective assistance claims: Deferential to the state court under the standards of §2254(d) and deferential to the defense attorney's strategy decisions under *Strickland*. *Woods v. Etherton*, 578 U.S. 113, 117 (2016). To establish prejudice, petitioner must show that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," which means "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

## IV. DISCUSSION

The court must start its analysis with whether Moore has offered new evidence that "could not have been discovered previously through the exercise of due diligence." 28 U.S.C.A. § 2244(b)(2)(B)(i). This new evidence must be coupled with a constitutional error. *See* 28 U.S.C.A. § 2244(b)(2)(B)(ii).

### A. Is Dr. Daniel's Affidavit New Evidence?

The Respondent urges the court to defer to the Court of Appeals of Virginia opinion in the state actual innocence case, which found that Dr. Daniel's Affidavit did not constitute newly discovered evidence. This court is constrained to defer to a factual finding from the state court. *See* 28 U.S.C.A. § 2254(e)(1) (West 2019); *see also Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). Section 2254(e)(1) states:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C.A. § 2254(e)(1).

For purposes of filing an actual innocence petition under Virginia's statute, a petitioner must have evidence that "was previously unknown or unavailable to the petitioner or his trial attorney of record at the time" of conviction and which could not have been discovered by the exercise of due diligence before the conviction became final. VA. CODE ANN. §§ 19.2-327.11(A)(iv)(a); 19.2-327.11(A)(vi)(a) (2022 Repl. Vol. & Supp. 2024). The Virginia courts have defined "due diligence" as a "devoted and painstaking application to accomplish an undertaking." *Tyler v. Commonwealth*, 861 S.E.2d 79, 89 (Va. Ct. App. 2021) (citation omitted). Applying

these definitions, the state court found that Moore's trial counsel could have discovered, before trial, medical literature offering a different calculation of time of death based on gastric contents.

Similarly, under federal law, the petitioner must show that the new evidence which underlies his constitutional claim could not have been discovered by the exercise of due diligence. *See* 28 U.S.C.A. § 2244(b)(2)(B)(i). On a second or successive habeas petition, however, the relevant period for discovery is prior to the petitioner's earlier federal habeas proceeding. *See Long v. Hooks*, 972 F.3d 442, 469 n.14 (4th Cir. 2020). Diligence, under federal law, requires the petitioner and/or his counsel to have "made a reasonable attempt, in light of the information available at the time, to investigate and pursue" his claim. *Long*, 972 F.3d at 469 (quoting *Williams v. Taylor*, 529 U.S. 420, 435 (2000) (discussing the materially indistinguishable diligence provision of 28 U.S.C. § 2254(e)(2)(A)(ii))). Due diligence, under federal law, is measured objectively and not by the subjective diligence of the petitioner. *See Blackman v. Davis*, 909 F.3d 772, 779 (5th Cir. 2018) (citing *Johnson v. Dretke*, 442 F.3d 901, 909-10 (5th Cir. 2006)).

As stated above, the state court found that Moore's trial counsel could have discovered, before trial, medical literature offering a different calculation of time of death based on gastric contents. Nonetheless, the issue before this court is whether Moore, by the exercise of due diligence, could have discovered this information prior to his earlier habeas petition. The issue, however, is not when Dr. Daniel's Affidavit was available to Moore. Dr. Daniel's Affidavit is dated November 7, 2022, and, thus, it was not available for Moore's 2005 trial or his 2008 habeas petition. The issue is when should Moore have investigated the medical examiner's opinion regarding the time of death based on gastric contents.

The factual predicate for Moore's new evidence is not that time of death can be estimated from gastric contents, which obviously was known at trial because the

medical examiner so testified. The factual predicate is that the medical examiner's testimony is different from the timeline discussed in medical literature and that other practitioners would offer a different opinion from the medical examiner who testified at trial. Moore, who is neither a lawyer nor a health care professional, in his Petition, claims that he was not aware of this until he read the case of *Helton v. Singletary*, 85 F. Supp. 2d 1323 (S.D. Fla. 1999). As a result, Moore, then, hired an attorney to find him an expert on gastric evidence, which led to his obtaining Dr. Daniel's Affidavit. Moore's Petition does not state when any of these events occurred. Exhibits attached to Moore's Amended Petition show that he retained an attorney on June 29, 2021, (Docket Item No. 10-1 at 33), and that this attorney began contacting experts by March 2022 to obtain an opinion as to the time of death based on gastric contents. (Docket Item No. 10-1 at 34-35.)

Due diligence "does not require the maximum feasible diligence," but only reasonable diligence under the circumstances. *Gray v. Ballard*, 848 F.3d 318, 322 (4th Cir. 2017) (internal quotations and citations omitted). Those circumstances, here, include that Moore is an inmate, without specialized medical and legal training and with limited access to medical research and expert databases. His efforts to obtain representation, including through the Innocence Project at the University of Virginia, are documented in his Amended Petition (Docket Item No. 10). As Moore argued in opposition to the Motion to Dismiss, claims of actual innocence must be supported by reliable evidence, not unsubstantiated allegations that the evidence exists. *See Shelton v. Dir. of Dep't of Corrs.*, No. 3:08cv270, 2009 WL 790013, at *5 (E.D. Va. Mar. 23, 2009). Upon receiving Dr. Daniel's sworn and signed Affidavit in November 2022, he first had knowledge of facts (not theories) that would support his claim. Based on these facts, coupled with the fact that Moore's Petition is based on a claim of ineffective assistance of counsel, the court finds that the factual predicate for Moore's claim could not have been discovered previously through the

exercise of due diligence. Therefore, the court finds that Moore's claim meets the requirement of § 2244(b)(2)(B)(i).

## B.  Has Moore Shown a Constitutional Violation?

Moore alleges that trial counsel was ineffective for failing to investigate, challenge and oppose the medical examiner's time-of-death estimate.  As noted previously, to establish ineffective assistance, Moore must show that counsel's performance was deficient under prevailing professional norms and that the deficiency prejudiced the defendant.  Moore cannot make those showings here.

Under *Strickland*, a court reviewing counsel's performance must be highly deferential to counsel's strategic decisions.  At trial, counsel procured the medical examiner's admission that he could not determine the victim's time of death.  His best estimation was that she died between two and four hours after eating.  Based on that opinion and Moore's testimony that the victim had eaten at 11:30 p.m., Moore's counsel argued that the time of death occurred when Moore was not present.  That was a reasonable trial strategy, using the state's witness to support a defense theory.  Decisions on what witnesses to call, what questions to ask and what arguments to make are quintessential strategy decisions for which counsel must be given wide latitude.  *See Gonzales v. United States*, 553 U.S. 242, 249 (2008).

Nor has Moore shown prejudice from the failure to introduce an opinion that the victim died within 30 minutes to two hours after eating.  Moore testified that the victim ate an egg roll before he left her apartment at 11:30 p.m.  One neighbor, Fitzgerald, saw Moore talking to the victim outside around midnight.  Moore's mother's boyfriend, who lived at the same apartment complex as the victim, testified that he gave Moore a ride to the motel around 12:30 a.m.  Jackson testified that Moore came into their motel room at 1:00 a.m.  Virginia State Police Agent Santolla testified that the drive from the apartment complex to the motel was approximately

17

five to 10 minutes.  Based on this timeline, a juror could reasonably infer that Moore had the opportunity to kill the victim before he returned to the motel, and that he came back to the apartments just after 3:00 a.m. to clean up the scene.  Because of those potential conclusions, Dr. Daniel's opinion would not help him any more than the medical examiner's testimony did.

The only difference in possible inferences is that jurors could decide, based on the medical examiner's testimony, that Moore killed the victim after coming back to the complex.  The cab driver dropped Moore off at 3:05 a.m. at the complex.  If the victim ate at 11:30 p.m., then death at 3:30 a.m. would be within the four-hour window estimated by the medical examiner.  The sounds Fitzgerald heard from the apartment around 4:30 or 5:00 a.m. could have been Moore cleaning the crime scene. Testimony such as that offered in Dr. Daniel's Affidavit does not show prejudice; it merely gives a jury the option to decide that the victim died during an earlier window of opportunity, whereas the medical examiner's testimony created the inference that she died during the later window of opportunity.  It does not demonstrate a reasonable likelihood of a different outcome at trial.  Further, that Dr. Daniel's opinion differed from the medical examiner's opinion does not show that the medical examiner committed perjury.  Experts frequently differ on matters of opinion; that does not mean either expert is lying.  *See Gimenez v. Ochoa*, 821 F.3d 1136, 1142 (9th Cir. 2016).

## C.  Has Moore Established by Clear and Convincing Evidence That No Reasonable Factfinder Would Have Found Him Guilty?

As stated above, a second or successive § 2254 petition is successful only if the petitioner can demonstrate that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder

would have found the applicant guilty of the underlying offense." 28 U.S.C.A. §2244(b)(2)(B)(ii) (quoted in *Long*, 972 F.3d at 470). This is referred to as the "actual innocence" standard. *See Long*, 972 F.3d at 470. The court must examine "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted…." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation and citation omitted). "The question, then, is whether the newly discovered evidence, and all the evidence old and new, clearly and convincingly demonstrates that 'but for constitutional error, no reasonable factfinder' would have found Petitioner guilty of [the] crime[]." *Long*, 972 F.3d at 470 (quoting §2244(b)(2)(B)(ii)). Thus, the court must consider all evidence in the case, including the new evidence -- Dr. Daniel's Affidavit and the additional impeachment evidence now available against the Commonwealth's witnesses, Jackson and Weis. When considering this new evidence with all the other evidence presented at trial, the court cannot conclude that no reasonable juror would convict Moore.

As discussed above, Dr. Daniel has a different opinion on time of death than the medical examiner does. One could argue that Dr. Daniel's opinion is the better reasoned of the two. Even so, Dr. Daniel's opinion does not make it likely that no reasonable juror would convict Moore. Jurors could believe the medical examiner instead of Dr. Daniel, or, as outlined above, they could decide Moore still had the opportunity to kill the victim under Dr. Daniel's timeline. Furthermore, Dr. Daniel's Affidavit calls into question the credibility of determining the time of death based on gastric contents, which might cause a reasonable juror to reject his opinions as well as Dr. Wanger's.

Nor does the additional impeachment evidence against Jackson and Weis accomplish what Moore hopes. Jackson, originally charged as a co-defendant, testified against Moore at trial regarding the possible motive for the killing: Jackson and Moore allegedly had stolen checks from the victim and forged her name on them

to make purchases.  The jury knew that Jackson had been seen on videotape uttering the checks at one location and that the victim was going to meet with police the next morning to view videotape from another location where a check was uttered.  They knew that Jackson's charges of conspiracy and first-degree murder had been reduced to a misdemeanor accessory after the fact charge, even though she had as much motive to kill the victim as she said Moore had.  They heard evidence that she was jealous-natured and that Moore had not told her he was involved with the victim sexually for the year and a half before her death.  They heard that she had a drug problem and that she worked as a stripper.  In short, Jackson was impeached at trial on many issues. (Docket Item No. 28-9 at 81-87).  The jury still believed her instead of Moore.  As the decision-makers, they were solely responsible for deciding who to believe.  Even if this court would have decided the case differently on the evidence, that is not the proper role of a federal habeas court on review.  Moore's additional evidence that Jackson received only two years to serve on the forgery charges, while grand larceny and uttering charges were dropped, would have been cumulative impeachment evidence and not likely to make a difference in the jury's decision. *See Huffington v. Nuth*, 140 F.3d 572, 581 (4th Cir. 1998) (noting that failure to introduce cumulative evidence does not demonstrate prejudice).

For similar reasons, the new evidence that Weis, the jailhouse informant who testified against Moore, was diagnosed with schizophrenia and other psychiatric disorders a year after testifying, does not add much.  Counsel argued the unreliability of jailhouse snitches and introduced the testimony of Lockhart, who shared a cell with Weis.  Lockhart testified that he never heard Moore discuss his case with anyone, including Weis.  He also said that Weis engaged in very strange behavior, including drinking out of the toilet and putting his head in the toilet bowl, and that Weis seemed to seek attention. (Docket Item No. 28-9 at 42-50).  That Weis later

was diagnosed with psychiatric problems would not likely add anything more to his impeachment.

Further, although Moore characterizes Jackson and Weis as the two main witnesses against him, he ignores the whole tapestry of evidence introduced by neighbors at the complex. Ferguson, who lived upstairs from Hatfield's apartment, testified that she heard Moore and Hatfield talking about checks that afternoon, but they did not sound upset or like they were arguing. Ferguson saw Moore talking to the victim around midnight and saw him outside her window around 5:45 a.m. (Docket Item No. 28-7 at 7-32). Bradshaw, Hatfield's best friend, testified that Moore had a key to Hatfield's apartment, although he denied having one. (Docket Item No. 28-7 at 67).

Moore's friend, Dye, who lived in the complex, testified that Moore visited him briefly the night of Hatfield's death and that Moore left his apartment around 11:45 p.m. because Dye had to be in bed by midnight because he worked the next morning. Freeman testified that it was 11:30 p.m. when Moore knocked on the door to the apartment to visit Dye. Wilson, the live-in boyfriend of Moore's mother, who lived in the same building as Hatfield, testified that he gave Moore a ride to the motel between 12:30 and 1:00 a.m. Moore admitted returning to the apartment complex by taxi after 3:00 a.m. to purchase some drugs. The taxi driver testified, and records showed, that Moore was dropped at the apartment complex at 3:05 a.m. His friend, Neal, who lived in a house down the street from the apartments, and Neal's girlfriend, Mitchell, testified that Moore asked them for a ride around 5:30 that morning. They could not take him to the motel, however, because Neal needed to be at the hospital for a procedure, but they took Moore to the hospital so that he could use the payphone to call a cab. They both testified that they saw something rolled up under his arm that looked like a hand towel or a t-shirt. Mitchell thought it looked like there might be something inside the cloth. A cab driver responded to

a 5:45 a.m. dispatch to pick up "a colored guy" from the hospital and drove him to the motel across the street from the one where Moore was staying. He could not identify the person he picked up, but he saw the person cross the street from the Ramada Inn to the Economy Inn.

Moore testified about his timeline, which was similar, but not identical to, that of other witnesses. He denied knowing anything about stolen and forged checks. He had explanations for what he was doing throughout the evening. The jury was not required to believe his explanations, however. The combination of testimony from the other witnesses has been held sufficient to support Moore's conviction. Nothing in the new evidence Moore asks the court to consider creates a probability that no reasonable juror would convict him, much less proves it by the clear and convincing standard.

## V. CONCLUSION

Based on the above, the court finds that Moore has failed to make the requisite showing to allow him to pursue his successive habeas Petition. For the reasons stated, I will grant the Respondent's Motion to Dismiss.

I decline to issue a certificate of appealability because Moore has not made a substantial showing of the denial of a constitutional right, and reasonable jurists would not find the court's ruling to be debatable or wrong.

An appropriate order will be entered this day.

**ENTERED**: April 22, 2025.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE